## In re WILLIAM J. LEMP BREWING CO.
### No. 7975.

District Court, E. D. Illinois.
Jan. 12, 1942.

Arthur Felsen, and Baker, Lesemann, Kagy & Wagner, all of East St. Louis, Ill., Carl W. Feickert, of Belleville, Ill., and Edward L. Wiese, of St. Louis, Mo., Robert K. Heineman, of East St. Louis, Ill., Elias Mayer, of Chicago, Ill., and Harry S. Gleick and M. Jack Garden, both of St. Louis, Mo. for various claimants.

WHAM, District Judge.

This case came into this court upon a petition for corporate reorganization under Chapter X of the Bankruptcy Act, 11 U.S.

C.A. § 501 et seq. The real estate and certain fixtures were subject to the lien of a first mortgage in the approximate amount of $150,000 and the lien of a second mortgage of a substantial size. The corporation was indebted in a large total amount to numerous and widely scattered unsecured creditors. Certain accounts and bills receivable were pledged as security to the Southern Illinois National Bank of East St. Louis, Illinois, but the principal part of the personal property of the debtor, consisting of machinery, equipment, supplies and finished product, was unencumbered.

The petition was approved, an operating trustee and an independent trustee were appointed to operate and administer the property under said Chapter X and an attorney was appointed to represent said trustees. The debtor, the first mortgage bondholders, the second mortgage bondholders, the trustee of the second mortgage, a creditors' committee and certain other creditors were represented by counsel at various hearings.

It appeared from the beginning that it was of the utmost importance to the stockholders and to all classes of creditors, secured and unsecured, that the corporation be continued as a going concern so as to save the good will and market that had been built up through past years of operation and to avoid an extremely heavy loss that would occur through the shutting down of operations. It appeared that if operations were suspended not only would a reorganization be impossible but if the corporate assets were then liquidated they would bring only a fraction of the value that it would be possible to realize if a plan of reorganization could be consummated or the property sold as a going concern. The only possibility of realizing anything for the unsecured creditors and the holders of the second mortgage bonds lay in perfecting and consummating a plan of reorganization and the only possibility of protecting the full value of the first mortgage bonds likewise lay in reorganization. It was apparent, too, that if operations were permitted to cease and the plant then liquidated, if a buyer could be obtained at all, the holders of the first mortgage bonds would receive less than fifty per cent of the face value of their bonds.

As a consequence the legal representatives of the debtor and of all classes of creditors, secured and unsecured, worked and cooperated with the trustees and their attorneys in an effort to keep the brewery on an operating basis, to procure harmony among the creditors and to secure approval of a lawful and feasible plan that would be beneficial to all classes of creditors.

The operation of the brewery proved to be costly and though some believed it might be possible for the trustees to operate without considerable loss and even break even or make a little money during the summer months pending reorganization their hopes were unfulfilled and operative losses were continuous.

By reason of the large amount of capital necessary to reorganize successfully and the hazardous character of the business due to the heavy tax outlay required, the cost of manufacture, the necessity for keeping heavy inventories on hand and the risk in the highly competitive market of not being able to build up an outlet for the product that would make possible a profitable operation, though the plant itself was excellent, it was soon obvious that it would be exceedingly difficult to interest parties having requisite capital. Many leads were followed but none gave much hope until one E. J. Grovier became interested and agreed to consummate a plan that would have been advantageous to all classes of creditors but stated that time would be required. All were hopeful and the first mortgage bondholders agreed to extend the first mortgage to make the consummation of the plan possible. As appeared necessary the time given for consummation of this plan was successively extended until it seemed beyond reasonable probability that Mr. Grovier would be able to fulfill his agreement. No other possibility of a plan appearing, upon petition the court adjudged the debtor a bankrupt and ordered liquidation. In the meantime large administrative costs had been incurred, including trustees' certificates, borrowed money, merchandise accounts and taxes, all necessary to keep the debtor on an operating basis.

Following the adjudication the property was appraised as a going concern and though the appraisal was not detailed as to the items in the plant or was not made with a purpose of segregating the real and personal property as to values the appraiser, upon being questioned in court by counsel for the holders of the first mortgage bonds, ventured the opinion that the real

estate constituted seventy per cent and the personal property, including inventory, thirty per cent of the appraised value.

Following adjudication the trustee was ordered to continue to operate the plant but immediately to advertise it for sale as a going concern free and clear of all liens, at public sale for cash, an upset price of $150,000 being fixed. The sale was held and the Independent Realty and Investment Company, representing the first mortgage bondholders, bid in the entire property as a going concern for $150,000, paid the money into court and the sale was approved.

As a sidelight on the situation worthy of mention, the bid of the Independent Realty and Investment Company was made after an arrangement between it and said E. J. Grovier and an associate worked out and entered into during the progress of the sale, that the latter would form a corporation and take the brewery over upon terms that will be advantageous to the first mortgage bondholders. If the terms of the arrangement are completely fulfilled, they will lose little or nothing and if it fails they will still be in better position than if the brewery had been liquidated as a non-operating property.

As a result of the foregoing facts and circumstances, after paying out of the proceeds of the sale lawful allowances for administration costs and expenses, including operative losses, trustee's and attorneys' fees and other necessary administrative expenses, after proper allocation of same, if allocation be required, the remainder of such proceeds will go to the first mortgage bondholders and there will be nothing for second mortgage bondholders, common creditors or stockholders.

The case is now before the court for determination of proper allowances and to make disposition of the contention of counsel for the first mortgage bondholders that only the proceeds of the so-called free assets or thirty per cent of the sale price can properly be applied to the payment of administrative fees and expenses. It is conceded by said counsel that the remaining portion of the trustee's fees and his counsel's fees and also the trustee's certificates may be paid out of the proceeds of the real estate after they have been reduced by their proportionate part of the $45,000 which represents the thirty per cent of the sale price of $150,000 shared with other claims for administrative expenses and for fees and allowances.

Unpaid claims which have been allowed for expenses incurred by trustees are as follows:

| | | |
|---|---:|---|
| Taxes | $ 5,956.18 | |
| Merchandise Claims | 21,378.95 | |
| Trustee's Certificates 1st National Bank, E. St. Louis | 21,048.34 | Including interest to Dec. 22, 1941. |
| Southern Illinois Bank, collected by trustee for services | 11,463.92 | |
| Muren & Co. Accountant's fees | 1,695.00 | |
| Total | $61,542.39 | |

One of the claims included with the merchandise claims is that of E. J. Grovier for $7,500 for money advanced to the trustees to build up the inventory of beer with an agreement for a lien securing said sum upon a specified quantity of beer in the cellar.

Claims for fees and allowances have been made by the independent trustee in the sum of $6,750 (the operating trustee who gave his entire time to the management of the business until relieved several months ago was paid a monthly salary and now makes no claim) and by counsel for trustees in the sum of $6,750, by counsel for debtor, for creditors' committee, for trustee of second mortgage bondholders, by counsel for the first mortgage bondholders and by the trustee for the second mortgage bondholders in the approximate total amount of $7,500.

From a study of these claims it would appear that the claimants are seeking allowances for all of the time and labor they have expended in connection with this case and expect nothing from their clients. This is quite proper on the part of the trustee and his counsel. As to those who represent creditors, the law, under the most favorable circumstances, would permit them to be compensated from the estate only to the extent that they have rendered services to the estate. Under no circumstances can they be paid from the estate for services rendered for the sole benefit of their clients without corresponding benefit to the estate. If a desirable plan of reorganization had been successfully put into operation, the claimants for fees would be entitled to more liberal allowances than can be given when all plans have failed and the property had to be sold in bankruptcy, as here. It may be pointed out that the failure to obtain the consummation of a feasible plan was the fault of no one. All did their

best to help. Nor did any one of the claimants render any service by opposing and preventing the adoption of a bad or unwise plan. All wished for the consummation of the plan that was submitted and approved by the court which would have been advantageous to all except the stockholders. Now that the plan and all plans have failed and the plant, including free and encumbered assets, has been sold free and clear of encumbrances through the bankruptcy court for a price smaller than the face value of the outstanding first mortgage bonds with interest due thereon, what is a proper distribution of the proceeds of the sale?

Certain facts should be considered. (1) The first mortgage bondholders did not object to the reorganization proceedings but participated therein and stood to secure substantial advantage if a plan of reorganization could be successfully consummated. (2) The reorganization proceeding preserved the brewery as a going concern and preserved its market and good will to a limited extent thus adding very substantially to the value of both the free and the encumbered assets and the amount that was realized from the sale. (3) The first mortgage bondholders made no objection to the sale of the plant free and clear of liens and made suggestions with reference to the details of the order for sale, including the upset price fixed by the court. (4) Counsel for first mortgage bondholders seek an allowance of $2,000 in fees, to be paid from the estate which claim is based upon the work done by consel throughout the proceeding and up to and through the sale.

 In view of the foregoing facts I have concluded that under the proper construction of the Chandler Act, including Chapter X thereof, all the proper costs of administration of the estate, including proper allowances for fees, should and must be assessed against the entire fund in the hands of the trustee and no particular items thereof should be made payable out of the proceeds of the proceeds of the free assets only. Indeed, it is properly questioned as to whether any fair device is available by which the proceeds of the sale can be fairly allocated to the free assets and the assets covered by the lien of the first mortgage. All of the proceeds of the free assets will be expended in meeting such costs and expenses and the proceeds of the encumbered assets must bear the burden of the remainder. The allowances for fees must be limited to amounts which will fairly compensate for services that were, in fact, beneficial to the estate.

Guided by the foregoing principles and conclusions the claims are allowed to be paid from the funds in the hands of the trustee as follows:

1. All claims listed in paragraph 12 of this opinion.

2. To Norman J. Gundlach, independent trustee, $5,000.

3. To Arthur R. Felsen, attorney for trustees, $5,000.

4. To Edward Wiese and Carl W. Feickert, attorneys for the debtor, $800.

5. To Elias Mayer and Robert K. Hineman, attorneys for creditors' committee, $800; to Mayer for expenses $293.46 and Hineman $5.42, $298.88.

6. To Harold G. Baker, attorney for trustee for second mortgage bondholders, with expenses, $406.75.

7. To Nathaniel C. McLean, trustee for second mortgage bondholders, $150.

8. Jack Garden and Harry Gleick, attorneys for the first mortgage bondholders, $800.

Trustee will present order accordingly.